17-1428 W.C. So we saw a high school visitor, whether it was Joe Matt v. Jason O'Farrill. Council, my name is Theodore Powers and I represent the Provisional Township High School District number 209 in this matter. The issue before you this morning is a manifest plate question with a little bit of a twist to it. We have a decision of the commission and a determination on causal connection and a denial of the knee condition being causally related. And the circuit court reversing the decision of the commission in terms of what the evidence provided. This is our second time here. I think we were here before you in 2015, 2016. And it was after the initial circuit court order and there was a remand order and for whatever reason we decided to bring it up here. And you quickly sent it back down, but then that then led to a loss of some of the evidence at the commission which had to be recouped. So it took a while to get back up here. I have been before this court probably now 20 years. I've been coming from time to time before you. Sometimes here, sometimes Springfield. Pardon me? Sometimes here, sometimes Springfield. Correct. Yes. And along the way, I've learned a lot about how this court looks at manifest plate evidence. It's to be able to follow the law, right? Pardon me? We follow the law. You follow the law. The standard of review, it requires a great deal of deference. I learned along the way, I remember one case in particular was unreported where I had three doctors on causation and one doctor, the treating doctor, who said there was causation. I had three who didn't. And I lost and I couldn't believe. I got three doctors to one doctor. How can I lose? And it's like, well, it came down to the fact that it is the commission that will determine the evidence. They will weigh it. They will determine what's credible. And they will draw the proper inferences and that's how it will be decided. And so You'd have to tacitly concede, though, wouldn't you? It doesn't just necessarily apply in the workers' compensation area. It applies in everything with that standard. There are several cases that say the number of experts on one side or the other is not determined to be the result. No. No, but I use that as an example just for here because what we have is a dispute with the circuit court taking issue with the commission's determination of weighing the evidence of an IME doctor and saying, well, wait a minute, the IME doctor misinterpreted or the commission misinterpreted what the IME doctor meant. The commission misrepresented what he said. They took his comments out of context. But putting all of this in the issues of the case, and I appreciate the warm-ups, in this case, the commission ultimately, or any original decision, relied heavily on Dr. Miller's reports and their surveillance footage. Correct. That's essentially what they hung their head on, right? Correct. So what was wrong with that? There was nothing wrong with it. There was nothing wrong with that decision. The arbitrator made that decision. The commission, if you look at the commission decision, it wasn't just an affirmance, a sign-off with the magic language. They went and expanded upon it. They went into Dr. Miller's opinion as to why they relied upon that in terms of denying causation. And then, even though it's in dicta, when it came back up here through the commission again on remand, of course, they, according to the mandate of the Super Court, they changed it, and they again talked about when they looked at this, and it was a different panel. When the commission looked at these facts, they did their job, and we can't see that there was anything wrong with what they did. They didn't misinterpret. They didn't do anything. So then the alternative question, how did the circuit court err at reversing the commission? Well, you know, I looked at it, and I actually phrased it in such a way. I said they exceeded the scope of their authority. I was only doing that to maybe garner your attention because I know manifestly it gets to be probably boring after a while. But when I looked at what the circuit court did, to me it looked like the circuit court lost track of, he was supposed to be in the review process as opposed to he was a sitting judge hearing the evidence. That decision, if you look at it, he is making inferences. He's looking at Dr. Miller, the IME doctor, making reference to he only saw her one time, making references to the claimant is sitting there and made comments about her work duties that were contrary to what Dr. Miller had found in terms of her ability to perform her job. So what you're saying is sometimes we see this in the circuit court. Instead of applying the manifest weight, the circuit court was sort of doing a semi-de novo review of the evidence. Correct. And that's what was my impression. Which it's not supposed to do. When I looked at it, I went, I think you confused that line where you're trying to weigh the evidence to make sure there's ample evidence to support the commission determination. You may not agree with it, but it's there as opposed to, no, you didn't read this right. You know, he said that there may be a meniscal tear, so then that turned into, well, there was a meniscal tear. And there was a real question about that. All the evidence in this record in terms of her knee, it's a knee case, basically, a knee and a shin is the way it worked out. There were questions as to whether she had a meniscal tear. The radiologist says it looked like there was a small or an oblique tear of the medial meniscus. And Dr. Miller talked about that. But then Dr. Miller also noted that there weren't any symptoms of a meniscal tear when he evaluated her. He also noted that her complaints were on the lateral side and there were talk of a medial meniscus. That's inconsistent. However, he did talk about she had a perineal neuropathy or contusion to the perineal nerve, which would be on the lateral side. That would explain her complaints of the lateral pains that she had. And so then what it came down to, he noted, and there's also degeneration of the knee joint. And a meniscal tear could be degenerative as well. It's so small. And then finally, he noted, I went back over it again when he looked at everything again, and said, I don't see a tear. I can't find a tear. And I can't relate the knee condition and that condition, which is degenerative, to this accident. And I looked at the surveillance and I watched her moving around. She's doing things contrary to having a tear. So based upon all of that, you know, he made this conclusion. The commission looked at it. Clearly, they looked at it carefully because they wrote extensively about it. And coming to the conclusion that they were adopting and relying upon the opinions of Dr. Miller as opposed to Dr. Tonino, who was the doctor who wanted to do the surgery. And keep in mind, Dr. Tonino kind of changed this to maybe a tear as opposed to now there's a full tear. Which one is it? That's a little bit inconsistent. It's like, what are we dealing with when you start making those comments? And plus the fact he didn't talk about, I'm going to go in and do a repair of the meniscal meniscus. I'm going in to explore. I'm not sure what it is. So all the facts, and I think that's exactly what happened. I think that we have the judge kind of went off on one, just a little bit off that line as to, this is not a question as to, I'm going to make the determination as to whether the commission made the correct one. Going back to what I made the comment earlier, being before this Court, you've always said that you will look to the commission as a fact finder. We don't care what the circuit court says. We want to look and see what the commission says. Because the commission is a fact finder. And we give deference to them under the standard of review, under the Manifest Wage Standards. So that's what I believe is what happened here. I believe that there was evidence that clearly, clearly supported it. It was sufficient to support a denial on causation and a cutoff of the TGD benefits at that point and a denial of the prospective surgery. So we would ask at this juncture that the appellate court reinstate the commission's decision and overturn it. Thank you. Thank you, counsel. You'll have five minutes in reply. Counsel, you may respond. Police court. Good morning, Your Honors. Counsel. I obviously have a different. Who are you for the record? Oh, I'm sorry. My name is Nick Perone. I represent Tracy McCormick in this matter. This is a longstanding case, and I don't disagree that the Manifest Wage is a high hurdle to overcome. There's not a lot of cases in which the circuit court overturns the commission. With that being said, the commission's decision is not set in stone, or else there would be really no point in having a circuit review or an appellate review. You would just, you know, what would be at the commission's. So what is the criteria for Manifest Wage? Does the circuit court get to reweigh the evidence? No, they do not. So what's the – what is the circuit court supposed to determine? So the Manifest Wage – I have to go back to my brief. But the Manifest Wage – Well, an opposite conclusion is clearly apparent to the one drawn by the commission. That's the best way. What does that mean?  Can you say that again? The extent of the view is, is a decision – you uphold the commission's decision unless an opposite conclusion is clearly apparent. Correct. What does that mean? So when you look at the totality of the evidence, right, is the decision of the commission the opposite conclusion that can only be? If there's valid evidence in the record that supports the commission's decision, can it ever be against the Manifest Wage? I'm sorry. Say it again. If there is valid evidence in the record that supports a commission's decision, can that decision ever be found to be against the Manifest Wage? It would be a tough time, but I think the key there is valid evidence, right? And that's the issue I have with the – Okay, what's invalid about Dr. Miller's? Well, Dr. Miller's reports are all over the place, frankly, you know. So we have everyone – all these treating doctors, including Dr. Miller in the beginning, is all in agreement that they should explore this nerve issue, right? That's the first – and I think we have to separate the parts of the knee and what they were discussing that's in the record. All of the doctors originally agreed that we should look at this nerve issue and determine if this is the cause of her pain. EMG is done, it comes back normal. And so that's – the perennial nerve issue is ruled out, essentially. There is the disagreement between Dr. Miller and Dr. Tonino and the radiologist about the meniscal tear. What our contention here is we have Dr. Miller say in his last IME report that he still disputes the findings on the MRI regarding the meniscal tear. He then goes on to say, but Dr. Tonino's recommendations are appropriate of an injection and then a scope surgery, which the purpose of a scope surgery is to actually see what's going on in the knee. He admits in his report that up to 20% of torn cartilage is missed in the MRIs. And then his sort of basis of it is that anything in the knee is basically preexisting. Well, let's assume in light of Justice Sotin's question that you might have some – you can legitimately point to some issues with regard to Miller's testimony. They can point to some issues with regard to the other expert testimony. But generally, it's up to the commission, would you agree, to assess the weight and credibility of the evidence. So tell us why Miller's testimony would be inherently flawed. Well, it's not based on – we don't believe there's a good faith basis for his opinion that her condition is preexisting. There's no evidentiary basis for his opinion. Well, we don't believe so, no. I know you don't think so, but tell us why it's inherently flawed. So if there is a contention that the knee issue is preexisting, right, there's no evidence that it is preexisting. And if it is preexisting, then why – how is this not an aggravation of that? She had a clearly identifiable work injury in which she fell on a manhole. That is undisputed. The record is completely devoid of any prior knee issues at all. No knee treatment. No prior reported work injury. And now we have a scenario in which the IME doctor says, well, it's preexisting. And the commission, I think, didn't really comment on this, and this should have been addressed at least at the commission level after this initial hearing. Does the case completely stand and fall on Miller's testimony? What about the surveillance footage? He cites that as support for the commission's decision. What do you have to say about the surveillance footage? I would take the circuit court's opinion on the surveillance videos, that it doesn't really tend to show anything as opposed to causal connection, which is really what this case hinges on. I believe the majority of the surveillance, what it was used for, was to determine whether or not she was able to go back to work, which are two different issues. And truthfully, the surveillance didn't really show anything. It showed a woman going about her day and operating normally. That doesn't go, I guess I don't see a correlation between the surveillance videos and immediately saying that her knee issue, if any, is preexisting. So that's the way the circuit court viewed it, and that's the way our position is that the surveillance videos don't go to causal connection at all. So what is her condition of ill-being? The meniscus tear. Isn't Miller's opinion that based upon the surveillance footage she didn't have a meniscus tear? And that's one of the reasons why he disagreed with the radiologist? Well, he said that he didn't see any symptoms, but then in his last IME report he said that she had two documented issues of knee locking, which is evidence of a meniscus tear. So he contradicts himself there. So that's our main issue, is that despite all of the evidence here, the commission chose to view all of Dr. Miller's IME reports and lump them together, which that's not how they should be read. They should be read in conjunction with whatever was going on with the rest of the treatment at the time the IME report was given. And then basically cherry-picked statements out of each IME report to support their contention that his opinion is the one that should be viewed upon favorably, namely it is a preexisting condition issue. There is one, I want to swing back and go back to the aggravation portion. If there's a preexisting condition, I didn't touch on it in my brief as much as I would have liked to. Particularly on page 16, I cite the Daly Machine Corp. The fact that she has, you know, if we take the assumption that she does in fact have a preexisting condition, I still think this should be addressed by your honors in their decision. That's not in and of itself a bar for recovery. I cited the Daly case. The Daly case is just giving us the standard. I did find another case that unfortunately I didn't find when I was writing my brief. I would like to at least give you that side. I won't go into detail with it because it's putting him at a disadvantage. I didn't file a motion to say additional authority. Arguing the case, you didn't put it in your brief. It's like checking a raise on the card game. You're in no trouble for it. Yeah, I didn't have time to do that. But there is, I will state this, there is case law out there to support the fact that just because that petitioner may have had a preexisting condition, it was in and of itself bar recovery. And I think that's exactly what the commission did here, is that they chose to take Dr. Miller's opinions, even though they were measurably flawed in our opinion, and apply this as a preexisting condition. And I think the circuit court judge, in his decision, what he did very well, was say we have an identifiable injury, we have consistent treatment throughout, and no evidence of anything prior to this, to substantiate this IME doctor saying, oh, well, I can't identify what's in the knee. I can't identify what's in the knee. She's showing some degenerative changes, but none of it's related to the accident. And then there's the other basis for it. And I think that's the issue that the circuit court judge had with his opinion. So that's all I have. Thank you, counsel. Thank you, Judge. Thank you. Counsel, you may respond. A couple of points. In the course of your address, not to sidetrack you, could you address this argument hanging in the air, where you're essentially saying the surveillance video is basically meaningless? What's your reaction to that? I didn't even hear that. He's essentially saying, really, the surveillance video has much to do about nothing. So what's the big deal with this? It doesn't really add anything. No, the surveillance actually does play a little bit of a role. I mean, there was a comment about a smoking gun. We don't have her running a marathon. We don't have, you know, something where she's out doing something really heavy. But what it does show, someone who is claiming that they have a meniscal tear and is able to walk back and forth, up and down and around, and not show any signs of any problems, that would be suggestive that you don't have a meniscal tear. Now, counsel had made a comment about, well, her knee did lock. Well, that locking of the knee came, I think, in June of 2013. I don't know, you know, she didn't have symptoms of locking when she initially had treatment. And also keep in mind, there were two injuries they were trying to figure out here. She had an injury to her shin, her left shin, and she also had it to her knee. She had a contusion on the knee. The shin, she had numbness. She was in a cam walker. They had to rule that out. The MRI ruled out that there was a perineal neuropathy. The EMG ruled that out. Our doctor, Dr. Miller, said initially, you probably have a contusion of the nerve. That's what it was. That was on the lateral side. Counsel talked about the totality of the evidence, and the commission directly dealt with that argument in their decision. And I can't give you two sides to that. Where they directly dealt with it on page two of their decision, the first decision. It's either under C-794 or C-1679, where they addressed specifically what the evidence showed and what Dr. Miller's conclusions were and the basis for the commission deciding to rely upon Dr. Miller. Again, I talked to you about the errors of the circuit court. I believe that the commission determination is certainly substantiated by the record. And we would ask that this fellow court reverse the circuit court and reinstate the commission decision. Thank you. Thank you, counsel. Thank you, counsel, both for your arguments on the matter this morning. We'll be taking our advisement if this position shall issue. If we can't, the court will stand in recess until 1 p.m.